G~a.ston, Judge.
The first question presented for our consideration in this case is, what is the proper construction *80 of that clause of the will of Stephen Woodson under which the plaintiffs set up title to the negroes in dispute. The will was executed in Virginia, and the testator was domiciled in that State. The law of Virginia therefore governs its exposition. It would have been gratifying to us had we been furnished with judicial decisions of Virginia, showing the construction there placed on bequests of a similar character ; but none such have been presented. We must therefore presume, and such is admitted by the counsel on both sides to be the fact, that this bequest would be interpreted in Virginia, precisely as a similar bequest made in this State would be here interpreted.
The clause is in these words: “ I give unto my granddaughter Judith T. Allen, ten negroes, by name Molly, &c., to have and enjoy the said negroes during her natural life, and at her death to be equally divided amongst the heirs of her body, or in case she should die without surviving child or children, that the said negroes, with their increase, shall return to my three grandsons as above named or their heirs.” The three grandsons here referred to are Henry T. Wood-son, Joseph R. Woodson, and Stephen T. Woodson, to each of whom “ and to his heirs forever,” the testator hath in preceding clauses of his will bequeathed sundry negroes absolutely, and whom by subsequent clauses he hath constituted his executors and residuary legatees. The Court below held that under, this clause the testator’s granddaughter Judith took the entire property in the slaves bequeathed, subject only to a contingent executory limitation to the testator’s grandsons, in the event that the said- granddaughter should leave no child living at her death. The argument by which this construction is upheld is understood to be this. It is a general principle that where a bequest is made of personalty by words of limitation, which either directly or constructively give an estate-tail in freehold property, such bequest passes the entire interest therein.
It is also an established and well known rule (commonly called the rule in Shelly’s case) that where by the same instrument there is a limitation of a particular estate of freehold to an ancestor, and a limitation of the inheritance to the heir or heirs of the body of such ancestor, as a remainder ex *81 pectant theieon, the latter shall not be allowed to take effect as' an independent remainder to such heirs, or to confer any estate on them by purchase, but shall operate by annexation to the former to pass the entire estate in fee or in tail to the ancestor. If this were a devise of realty, the rule in Shelly’s case would apply to it proprio vigore, because there is an estate for life therein given to the granddaughter,- and a remainder, on the determination of that particular estate, to the heirs of her body, whereby án immediate estate-tail vests in the granddaughter. As it is however a bequest of personalty which cannot be entailed, it passes the entire estate to her — nor is this construction inconsistent with the subsequent provision, that if she shall leave no child surviving her, the negroes bequeathed shall become the property of his grandsons, for this provision is but a declaration that the interest or estate previously given, shall, on a subsequent contingency happening within a reasonable time, shift from the person to whom it has been given, and vest in others designated by the testator.
Although the correctness of the general principles asserted in this argument is not to be questioned, nevertheless we do not adopt the conclusion drawn from them. Before the application of the rule in Shelly’s case it is always proper first to ascertain whether on the true interpretation of the words of the gift there is a limitation of the inheritance in remainder to the heirs or to the heirs of the body of one to whom a precedent freehold is given — such a limitation does exist when the gift is to them in the quality of Iilkts — embracing the same number in succession of objects and conferring the same extent of interest as would be embraced and conferred where the inheritance has been limited to the ancestor. The word “ heirs” is so peculiarly-appropriated to the expressio of the legal idea of a class of persons succeeding by inheritance from one generation to another — that ordinarily in grants and donations of land and other conveyances thereof inter vivos, no other word or set of words is deemed adequate to its expression — and therefore ordinarily a gift in remainder after a life estate in such an instrument will not be understood to be made to any persons as heirs unless the term heirs be expressed. But in devises where *82 legal words of inheritance are not indispensable to declare an intention of passing an inheritable interest, although the exPressi°ns “ heirs” or “ heirs of the body” in the gift of the remainder are not used, but “ issue,” “ children,” or any others manifesting, either of themselves, or from connection with the context, an intent that the gift is to those so called as heirs or heirs of the body — comprehending the whole line of succession — the rule in Shelly’s case is to be applied.
On the other hand, as the law will not entrap men by words incautiously used, if in the limitation of a remainder by any instrument of conveyance, the phrase “ heirs” or “ heirs of the body” be expressed, but it is unequivocally seen ' that the limitation is not made to them in that character, but simply as a number or class of individuals thus attempted to be described ; then the whole force of the phrase is restricted to this designation or description — it shall have the same operation as the words would have of which it is the representative ; there is not in fact a limitation to “ heirs,” and of couz’se there is no room for the application of the rale.
In conducting this preliminary inquiry, however, it is to be borne in mind that all expressions to which the law has attached a definite meaning are to be understood in that sense unless there be clear evidence that a different meaning was intended to be conveyed by them. The words “ heirs of the body” are technical expressions. In limitations of real property they are the most apt and appropriate terms to describe the whole direct line of inheritable successors, and therefore in construing a limitation to “ heirs of the body,” especially in England, where estates-tail or inheritances de-scendible in the direct line only, are recognised; these terms will not be understood in a different or less extensive sense, without unequivocal evidence that they have been used by mistake. This principle obtains in the construction of all conveyances as well by will as by deed, but with this distinction, that in the latter, where greater accuracy of expression is required, the technical sense is controlled with more difficulty than in the former, which are often made without an opportunity of legal advice. It is not necessary for forming an opinion on the bequest before us, that we should determine whether, if it had been a devise of lands and a de *83 vise made before our act of 1784 abolished estates-tail, there be such unequivocal evidence of the misapplication of these terms as would warrant their being interpreted in a different sense from that which properly belongs to them. In determining that question we should have to encounter many clashing adjudications in the English Courts ; but we believe and have so decided in the case of Ross v. Toms, 4 Dev. 376, upon a will made in 1777, that the better opinion is, that the direction for an equal division among the heirs of the body, would not be sufficient to overrule the technical meaning of those words ; and probably even the addition of the subsequent limitation to the grandsons, on Judith Allen dying without a living child or children, would be ineffectual for this purpose.
The clause which we have to interpret contains a bequest of personalty only. Now the term “ heirs of the body” in a gift of such property is not an appropriate, much less a technical term. It does not import a succession in the direct line of descents, because by law there is not and never was such a succession in the case of chattels. It must have some other meaning, and therefore in prosecuting the inquiry what is that meaning, so strong a demonstration that the phrase was used as a designation of individuals is not demanded as is indispensable where, as in devises of realj estate, it is attempted to overrule its precise legal signification. Yet if a chattel be bequeathed to one and the heirs of his body, although the latter words are not technically correct as words of limitation, nevertheless as they import an intention of the testator that the thing is so given that, it may be transmitted from and through the legatee to his issue, and as this intent cannot Well be effectuated, unless the whole interest be vested in the legatee ; standing alone it furnishes a clear legal inference of a gift of the whole interest. So when a bequest is made to one for life with remainder to the heirs of his body — inasmuch as in such limitations where the phrase heirs of the body is properly used, the legal operation is the same as in a direct gift to one and the heirs of his body— the law will infer from it, if unexplained, the same intent of a complete gift to the first taker. But when to such a bequest, limitations are added which are inconsistent with, and *84 repugnant to the presumption of an intent to vest in the legatee an interest to be transmitted from and through him to his issue, it is settled that these words “ heirs of the body” shall be regarded as designating a class of individuals, the personal and direct objects of the testator’s bounty, described by a term unapt indeed, yet sufficiently intelligible to permit of their being ascertained. And when from other expressions in the will explanatory of this inartificial description — or by fair inference from the context — it can be collected who are really thereby meant, the bequest will be construed throughout as though this meaning had been declared in the most explicit language, and the persons had been named instead of being described.
Upon the clause before us we think it manifest that by the term “ heirs of the body,” the testator did not contemplate a class of persons to' take by transmission from and through the first donee, in the nature of heirs, but that he did intend a class of individuals to take as original and independent objects of his bounty. And we also think that he has pointed out these individuals with such distinctness as to leave no fair doubt of the persons by him intended. After the gift of the slaves to his granddaughter, which he expressly declares shall be for her life, his words are. “ and at her death to be equally divided between the heirs of her body this division which the testator expressly directs to take place the moment her life interest expires — at her death — is irreconcilable with the supposition of a gift of the entire interest in her. Such a gift in this case would have vested the whole property in the husband, if reduced into possession during coverture; and if not so reduced would at her death— when the equal division is ordered — have passed it to her executor or administrator. This equality of division manifests an intention that the legatees shall take distributively and as purchasers — not in succession, but all at the’same time; that they were regarded by the testator as having personal claims upon his bounty, and were therefore the direct objects of this provision — receiving it through him, and not dependent for its enjoyment on the prudence or favor of others. But when with this evidence we combine that furnished by the immediately succeeding part of the clause, not *85 only is this intention almost irresistibly indicated, but the objects of his personal bounty are plainly declared. The words are “ or in case she should die without a surviving child or children, that the said1 negroes should return to my three grandsons or their heirs.” The division directed to be made at her death is not peremptory and unconditional. It is but one alternative of an entire disposition, and we collect its intent the more distinctly by looking at the other alternative. If at the death of Judith Allen, there be children of hers living, the property is to be divided among certain persons whom he describes as being “ the heirs of her body,” but if there be no such children then it is to go to his grandsons. “ Children” we have seen may mean “ heirs of the body;” and “ heirs of the body,” when not a term of description but of purchase, do mean either “ children or issue.” The testator here tells us almost as plainly as if he had subjoined a definition of heirs of the body, that he means by them children. This exposition seems to us to derive confirmation from an examination of the entire will. Every disposition of the testator’s property, except what is contained in this clause, is made to one or the other of his grandsons, and to them collectively is given all the residue of his estate real and personal. In each disposition to his grandsons the words of donation are absolute and full —“ unto him and his heirs or unto them and their heirs forever.” But when he is about to provide for his granddaughter and the offspring of his granddaughter, he changes the form and mode of disposition. He limits the provision which for this purpose he takes out of his estate, in the first place to her, to be enjoyed for the term of her natural life — then at her death to be equally divided between the heirs of her body, provided she leaves any child or children surviving her — but if not, then to return to his estate which he has given his grandsons.
The reason for this modified provision is so obvious that we can scarcely doubt about it. An absolute gift to her, might and probably would put it in the power of her husband or of her husband’s creditors to strip her and her offspring of the whole of this provision. He intended it for her benefit as long as she lived, and for the benefit of her chil *86 dren afterwards, if at her death she left any. For these purposes only he took it out of his' general property — and these, it was to fall back into that general property.
Rejecting the interpretation which makes ' the words “ heirs of the body ” words of limitation, and considering them as designating the children of Judith Allen, our next inquiry is, whether under this bequest these children have taken a vested interest in the subject matter of it; or whether the legacy be yet contingent, awaiting the event of the said Judith leaving a child or children living at her death. The counsel for the plaintiff contends, that by the terms of this bequest an immediate interest passed upon the death of the testator to the two children then alive — postponed as to enjoyment until the death of their mother — and defeasible or liable to be divested on the event of her leaving no child living at her death. He further insists, that upon the birth of subsequent children, antecedent to the time of division, this vested legacy opened to take them in, and that upon the death of one of the children, after the death of the testator and before the time of the division, the share of that child passed unto his personal representatives. If the primary position that the bequest to the children is a vested legacy, be well founded, the inferences above stated are correct. Upon the best consideration however which we have been able to give to the case, we are of opinion that the position is not well founded.
The question whether a legacy be vested or contingent, is one almost as much overloaded with decisions as those arising upon the extent and application of the rule in Shelly’s case." In examining this question we shall forbear, as we have done with respect to those arising upon that rule, from attempting to reconcile these decisions with each Other; or where this cannot be done, from examining into their relative claims to our respect; but adopting what all acknowledge to be the true principles of construction, endeavor to apply them to the bequest before us. The first great rule is to follow out what, upon consideration of the whole frame of the will, appears to have been the testator’s purpose. Was it his intention to pass to the legatee a certain interest in the subject of the gift, previously to, and inde *87 pendent of its enjoyment, or was it his intention that legatee should not take except in the mode, under the circumstances, and at the time prescribed for its enjoyment ? To effect uniformity of decision, as far as practicable, many subsidiary rules have been sanctioned — but these are subject to so many exceptions — and especially to the great exception that they must all give way when the intent is otherwise made plain — that they have but very imperfectly accomplished that uniformity so much desired. It may be laid down as among the first of these, that the law Jeans to the vesting of legacies — and where the intention is left ambiguous, the law holds them to be vested — but as this inclination is mainly founded upon the presumption that the testator’s intention will thereby be the more effectually promoted— this presumption yields readily to evidence which repels the inference of such intent. Another rule on which at one time great stress was laid, and which although it savors of critical nicety, is still deemed worthy of respect, is founded upon the peculiar words of the bequest, as either making or not making an express distinction between the gift and the time of enjoyment. When the gift and the time of enjoyment are in terms distinct — according to this rule the legacy is to be regarded as debitum impresenti solvendum in futuro — but when there is no distinct gift in terms from the direction for its enjoyment — the legacy does not vest before the appointed time of enjoyment. But this rule also is controlled by indications of a different intention. Whether we confine our attention to the clause immediately under consideration, or extend it to the general scope of the testator’s will, we are satisfied that it was his purpose to make the bequest in question depend on the contingency of his granddaughter’s leaving a surviving child or children — and that it must be understood as a bequest to such of these children as may be living at her death. The legacy is not in terms given impresenti to be enjoyed in futuro. There are no express words of gift; but the gift is implied from, comprehended in, the direction for a division, and this division is not to take place untilthe death of the legatee for life. Nor is the division then to take place if she should survive her children, for in that event the property is to,go to his grandsons. This last *88 disposition is unquestionably contingent — for it is preceded express words of condition — “ in case.” It is not a limi-tation even after the determination of the former bequest— but is a substitute provided in case of failure of that bequest. The two bequests are connected by the disjunction “ or,” which both in common speech and in grammatical construction is adversative, that is to say — indicates an opposition of meaning between the parts of the sentence thus connected. One or the other is to take place, not both — and which shall take place, will depend upon the result of the same event— accordingly as that result shall be affirmative or negative. Although therefore these words of condition, “ in case,” are not expressly subjoined to the original bequest as they are to the substituted bequest; yet they are affixed to the former by obvious implication, almost as strongly as though they had been subjoined in positive terms. These bequests are alternative limitations, dependent on a contingency with a double aspect. Both are contingent, and which of them shall vest is to be determined by the state of things at the death of Judith Allen. Other considerations concur to strengthen this construction. The only purpose designed to be effected by this clause was a provision for the testator’s granddaughter during life, and afterwards for her children ; and it was intended to place this latter provision beyond the power of the granddaughter’s husband. The testator did contemplate the probability of some of these children dying before their mother ; for fie has declared that if all so died the provision should sink into his estate for the benefit of his residuary legatees. He did not contemplate the. probability of these children dying before their mother, leaving children, or he would have made some modification of the bequest by which to secure to Judith Allen’s grandchildren, the benefit of his bounty. The term children unexplained cannot comprehend grandchildren. . The word children, does not, properly speaking, comprehend grandchildren or issue. These are included in that term only in two cases, the one from necessity, where the will would be impervative unless the sense of the word children were extended beyond its natural import, the other where the testator has shown by other word that he did not intend to use the words children, *89 in its proper meaning, but in a more extensive sense. Now can any reasonable motive be assigned for the testator’s will that the provision should fail altogether, if none of Judith Allen’s children should survive her, except that the provision was intended for those only who might survive her ? Can it be believed that it was his purpose, as any of her children might die off in infancy before the bequest could operate beneficially, their father should succeed to shares in this legacy as next of kin, rather than that the fund should be preserved for the survivors ? If in order to provide for a case not contemplated by the testator, that is to say, of some one or more of Mrs. Allen’s children marrying and having children, and then dying before her, a suggestion should arise that he intended to vest the legacy instanter, whereby a share or shares might be transmitted to the children of those so dying, how can we reconcile this presumption to the strange provision by which these transmitted shares are to be divested? The portions of the deceased children are to pass to their children — but these portions thus transmitted, are to be taken away from them, if unfortunately — at the moment appointed for beneficial enjoyment — they should not have an uncle or aunt in being. The technical construction of the particular clause — its natural and obvious import — ■ and the whole plan of the will, make the legacy in question a contingent legacy.
This construction of the legacy being established we are of opinion that the plaintiffs are not entitled to the slaves, which they claim as forfeited under the statute of Virginia. The enactment of the statute relied upon is in these words: “ If any person or persons possessed of a life estate in any slave or slaves shall remove or voluntarily permit to be removed out of this Commonwealth, such a slave or slaves or any of their increase, without the consent of him or her in reversion or remainder, such person or persons shall forfeit every such slave or slaves so removed, and the full value thereof unto the person or persons thqt shall have the remainder or reversion, any law, usage or custom to the contrary notwithstanding.”
Several questions have been raised upon the argument *90 respecting the operation and construction of the statute which we deem it unnecessary to decide.
One of these is whether the statute is to be regarded in the light of a penal law — or simply as a law regulating the enjoyment and transmission of property. If it be a penal law it is strictly local, affects nothing more than can be reached and seized by virtue of the authority of Virginia, and therefore cannot be enforced in this state.
If it be a regulation of property, and if also it attached to these slaves in Virginia, so that when they left Virginia, they were of right the slaves of the plaintiffs, then it is the duty of the Courts of this State to aid the plaintiffs in the operation of their rights. Another question is, supposing this law to be one regulating property — whether the forfeiture of the tenant’s interest be complete until the property has passed beyond the limits of Virginia — or does it take effect upon the property’s reaching the line of that State — or when it is completed does it operate from the commencement of the act of removal ? and in the case first put, will the Courts of this State allow an extra territorial operation to the laws of another State ?
A third question is, whether this enactment was intended to apply, and according to its fair construction does apply, to a case where the tenant for life had bona fide acquired and held the slaves under an absolute purchase, and has removed them without fraud, under the belief that they were absolutely his 1 These questions are now mentioned merely to repel any inference that we have judicially passed upon them. We do not decide them, because if they were all determined in favor of the plaintiffs, the judgment of nonsuit ought nevertheless to stand.
The Statute of Virginia cannot, we "think, giving it the most extensive operation consistent, with a fair interpretation of its language, apply in any case except where there is a tenant for life with a vested remainder or reversion thereon dependent. When what is called a remainder is wholly uncertain and contingent — a mere executory limitation, which has not vested, and may never vest in interest — there is no one whose consent to the removal is to be asked by the ten *91 ant for life under the penalty of forfeiture — no one who in the language of the statute, at the time of removal hath the reversion or remainder of the slaves removed — no one who ■upon the misconduct of the tenant hath a right to consider his interest determined, and to take possession of the things which had been the subject of that interest.
The judgment below is to be affirmed.
Per Curiam. Judgment affirmed.